AO 91 (Rev. 11/82)   **CRIMINAL COMPLAINT**   ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>Joseph Garza VALENTINO and<br>Oswaldo Alonzo ZUNIGA | DOCKET NO. | |
| | MAGISTRATE'S CASE NO. | 14-1285M |

Complaint for violation of Title 21, United States Code, Section 846:
Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine

| NAME OF MAGISTRATE JUDGE<br>HONORABLE RALPH ZAREFSKY | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>June 23, 2014 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>FILED CLERK U.S. DISTRICT COURT<br>JUN 24 2014<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 846]

Beginning on an unknown date and continuing to on or about June 23, 2014, in Los Angeles County, within the Central District of California, defendants Joseph Garza VALENTINO and Oswaldo Alonzo ZUNIGA conspired and agreed with each other to knowingly and intentionally (1) possess with the intent to distribute, and (2) distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Joseph Fallon |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – ATF |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>June 24, 2014 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Jeff Mitchell x0698   REC: Detention

# A F F I D A V I T

I, Joseph P. Fallon, being duly sworn, do hereby state the following:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed for five years. As a Special Agent, I received training in federal firearms laws and regulations during the 14-week Special Agent Basic Training at the ATF National Academy in Glynco, Georgia. I regularly refer to these laws and regulations during the course of my duties. I have participated in the execution of several search warrants and arrest warrants related to violations of federal firearms laws. I have participated in undercover investigations and surveillance of individuals committing crimes of violence and persons in possession of firearms. I have a close working relationship with detectives in the Gang Detail of the Torrance (California) Police Department and as such have participated in the execution of arrest warrants and the investigation of crimes involving firearms and narcotics. I am currently assigned to the ATF Long Beach Field Office. I am also a naval Intelligence Officer in the Navy Reserves assigned to Naval Special Warfare and have deployed to Iraq and other combat theatres as such.

## II. PURPOSE OF THE AFFIDAVIT

2.  This affidavit is made in support of a complaint for Joseph Garza VALENTINO ("VALENTINO") and Oswaldo Alonzo ZUNIGA ("ZUNIGA") for a violation of 21 U.S.C. § 846, conspiracy to possess with intent to distribute and to distribute controlled substances.

3.  This affidavit is intended solely for the purpose of demonstrating that there is sufficient probable cause for the requested arrest warrant and does not purport to set forth all of my knowledge of the investigation into this matter. The statements set forth in this affidavit are based upon my experience, training, consultation with experienced investigators and agents, and other reliable sources of information relative to this investigation.

## III. STATEMENT OF PROBABLE CAUSE

4.  During the month of April 2014, a confidential informant ("CI"), designated CI-7394, stated that he had been in contact with an individual known as "Joey VALENTINO." CI-7394 stated that VALENTINO said that he (VALENTINO) had done numerous home invasion robberies of drug stash houses in the past.

5.  I instructed CI-7349 to give VALENTINO my under-cover cell phone number and told CI-7349 to tell VALENTINO that I wanted to meet VALENTINO for purposes of partnering with VALENTINO to rob a purported drug dealer of cocaine.

6.  On April 6, 2014, at approximately 10:50 a.m., I was contacted via text from 213-280-2916, believed to be used by

VALENTINO. The first text message said, "Hey joe goodmorning this is joey, danny boys friend. Ill bw calling you within the next 10 minutes, and if by anychance you don't answer, u have my number." The second text from this same phone number said, "when youre not busy call me, thanks."

7. On the same day, at approximately 11:00 a.m., I received a call on my undercover (UC) cell phone from VALENTINO on cell phone number 213-280-2916. I recorded the call. During the call, VALENTINO introduced himself and said he would like to meet. I agreed to meet VALENTINO but did not agree to a specific date. I told VALENTINO that I would contact him at a later date to set up an exact date/time to meet.

8. On April 8, 2014, I sent a text message to VALENTINO and made arrangements to meet the following day, April 9, 2014, in order to lead VALENTINO to a secured warehouse operated by the ATF for undercover operations and located in the San Fernando Valley neighborhood of Los Angeles, California (the "UC location").

9. On the same day, I made a recorded call to VALENTINO. During the call, I made arrangements with VALENTINO to meet at the Sears Department Store located on the corner of Victory Blvd. and Laurel Canyon Blvd. in North Hollywood, California.

10. On April 9, 2014, at approximately 12:47 p.m., I received a call from VALENTINO, who was using cell phone (213)-280-2916. VALENTINO stated he was at the Sears Department Store parking lot, located at the corner of Victory Blvd. and Laurel Canyon Blvd. I told VALENTINO that I would head right over and

have VALENTINO follow me back to the UC location. VALENTINO said he would be driving in a silver Mercedes Benz Sport class.

11. On the same day, at approximately 12:50 p.m., I departed the UC location in order to pick up VALENTINO.

12. On the same day, at approximately 12:55 p.m., I drove to the Sears parking lot. I immediately saw a silver Mercedes Benz (CA License plate # 6VSG13. I later learned that the Registered Owner was Joey Valentino 7046 Hollywood Blvd, Los Angeles CA, 90028) and drove towards it. The driver said hello and said that his name was "Joey." I also said hello and told VALENTINO to "follow me." VALENTINO immediately pulled his vehicle in behind me and followed me to the UC location.

13. On the same day, at approximately 1:03 p.m., I entered the UC location with VALENTINO following behind me. VALENTINO exited his vehicle and I introduced him to SA Kozlowski, who was acting in an undercover capacity and pretending to be a drug courier for a cocaine source of supply. During the meeting, SA Kozlowski explained to VALENTINO that SA Kozlowski was a drug courier and that SA Kozlowski wanted to rob the cocaine source of supply. SA Kozlowski then asked VALENTINO if VALENTINO was interested in partnering with SA Kozlowski to rob the cocaine source of supply. VALENTINO said that he was interested but that his former home-invasion crew were either dead or incarcerated. VALENTINO said that he would think about SA Kozlowski's offer and that he would try to recruit new co-conspirators for his crew.

14. In April 2014, SA Kozlowski attempted to contact VALENTINO several times at 213-280-2916 but did not receive a

response. In the morning of June 13, 2014, VALENTINO called SA Kozlowski and requested to meet with SA Kozlowski later that day.

15. On June 13, 2014, at approximately 12:30pm, SA Kozlowski arrived at an ATF controlled UC location where he had arranged to meet with VALENTINO. This location is equipped with audio and video recording equipment.

16. At approximately 1:20pm, VALENTINO arrived and notified SA Kozlowski via cellular telephone that he was outside the ATF UC location. SA Kozlowski proceeded to open the bay door and VALENTINO drove his vehicle, a Mercedes Benz bearing CA license plate 6VSG131, inside the ATF UC location. SA Kozlowski observed VALENTINO driving the vehicle as well as an unknown female seated in the front passenger seat and an infant child seated in the rear passenger seat. The female was not introduced to SA Kozlowski and both the female and infant remained in the vehicle parked inside the ATF UC location. At this point, SA Kozlowski and VALENTINO proceeded to the office area of the UC location.

17. SA Kozlowski asked VALENTINO what had happened as a result of the last meeting in April 2014 regarding the robbery of SA Kozlowski's cocaine source of supply. VALENTINO responded that he had traveled to New York for an emergency and also stated the individuals he was trying to recruit did not want to participate and VALENTINO did not know anyone else to ask (this was in reference to VALENTINO'S willingness to commit a armed robbery of a cocaine stash house on behalf of SA Kozlowski).

18. During their conversation, VALENTINO stated that he distributes "glass" (street vernacular for crystal

5

methamphetamine) and "K" (possible street vernacular for cocaine or Ketamine). SA Kozlowski stated that he would be interested in purchasing pound quantities of methamphetamine.

19. SA Kozlowski asked VALENTINO if VALENTINO was looking to purchase methamphetamine or sell methamphetamine. VALENTINO responded "either or." VALENTINO then stated that his current methamphetamine source of supply has been selling VALENTINO poor quality methamphetamine. VALENTINO stated that he purchases a pound for "47" (reference $4,700.00).

20. VALENTINO then switched the topic of conversation and told SA Kozlowski he needed to find a "coke" supplier (street vernacular for cocaine). SA Kozlowski asked what quantity he was looking to purchase. VALENTINO responded two (2) to ten (10) "keys" (street vernacular for kilograms). SA Kozlowski asked VALENTINO if he had the money for that much cocaine. VALENTINO told SA Kozlowski that he did have enough money, and the cocaine would actually be for one of his connections. VALENTINO told SA Kozlowski that cocaine was hard to come by and made a reference to his connection having previously purchased an initial quantity of ten kilograms from an unidentified source of supply and then having attempted to go back to purchase an additional twenty kilograms, but the source of supply failed to produce the additional cocaine. SA Kozlowski asked VALENTINO how much VALENTINO's connection was paying for cocaine and VALENTINO responded "twenty-five-five" (reference to $25,500.00 per kilogram).

21. At this point, SA Kozlowski showed VALENTINO a photograph depicting four (4) kilograms of cocaine and stated it was all pure. VALENTINO asked SA Kozlowski for prices for two kilograms of cocaine and for ten kilograms. SA Kozlowski told VALENTINO it would most likely be around $26,000 per kilogram but did not provide VALENTINO with an exact price. VALENTINO told SA Kozlowski that VALENTINO's connection would like to purchase twenty kilograms of cocaine but VALENTINO advised the connection to start out with ten kilograms. VALENTINO also stated this individual purchases twenty (20) to thirty (30) kilograms of cocaine at a time.

22. SA Kozlowski told VALENTINO that he would call VALENTINO later in the day and provide him with an exact price for the cocaine. SA Kozlowski asked VALENTINO when he wanted delivery of the cocaine. VALENTINO responded "yesterday".

23. VALENTINO told SA Kozlowski that VALENTINO remembered that SA Kozlowski had a cocaine supplier after VALENTINO realized that his connection was having a hard time finding a supplier. SA Kozlowski asked VALENTINO if his connection would be willing to come to the ATF UC location to do business. VALENTINO stated he would.

24. SA Kozlowski and VALENTINO agreed on trying to facilitate the cocaine transaction on Monday, June 16, 2014.

25. At this point, VALENTINO asked SA Kozlowski if he had a source for obtaining "crystal" (crystal methamphetamine). SA Kozlowski stated he would need to make a call but stated that he would only sell in pound quantities. VALENTINO agreed, and

stated that he purchases methamphetamine only in pound quantities.

26. VALENTINO told SA Kozlowski how he just lost $29,000.00 in ten days. VALENTINO explained how he lost $7,000.00 because a friend who he sells methamphetamine and heroin in Oklahoma was arrested but owed him $7,000.00 from the original $9,000.00 he had fronted for this individual during this deal. Then VALENTINO told SA Kozlowski that he traveled to New York four days later and was stopped by security going through JFK airport where he claimed authorities seized $15,300.00 in one hundred dollar bills from him that was contained in his back pack. VALENTINO then talked about his knowledge of the laws regarding traveling with over $10,000.00 with receipts but stated he had a receipt for $6,700.00 from a withdrawal from his own checking account.

27. SA Kozlowski asked VALENTINO how much crystal VALENTINO was looking to purchase. VALENTINO responded he wanted three (3) pounds but maybe would start with 1 ½ pounds first. SA Kozlowski stated he would make a call but told VALENTINO it would be easier for him to obtain the "coke."

28. At approximately 1:38pm, following some additional general conversation about the UC location, VALENTINO departed the UC location and the UC operation was terminated.

29. On this same date at approximately 5:36pm, SA Kozlowski telephonically contacted VALENTINO at cellular telephone number 213-280-2916. During the conversation, SA Kozlowski told VALENTINO the price for two kilograms of cocaine would be "twenty-six" (reference $26,000.00 per kilogram) and the price

for ten kilograms of cocaine would be "twenty-four-five" (reference $24,500.00 per kilogram). VALENTINO acknowledged and said he would call SA Kozlowski back after talking with his connection.

30. On June 14, 2014, at approximately 2:58pm, VALENTINO telephonically contacted SA Kozlowski and told SA Kozlowski his connection wanted to purchase two (2) kilograms of cocaine on Monday, June 16, 2014. SA Kozlowski told VALENTINO he would like to meet with VALENTINO'S connection before any transaction. VALENTINO agreed and a meeting was set for Monday, June 16, 2014 at 10:00am between SA Kozlowski, VALENTINO, and VALENTINO'S connection.

31. That same day at approximately 2:10pm, VALENTINO arrived simultaneously with ZUNIGA. ZUNIGA arrived in a separate vehicle further described as a Chevrolet pick-up truck bearing CA license plate 5K56701. VALENTINO arrived in a Mercedes bearing CA license plate 6VSG131. SA Kozlowski greeted VALENTINO, and VALENTINO introduced ZUNIGA to SA Kozlowski as "BLANCO."

32. As conversation began, SA Kozlowski explained his connection to his cocaine source. At this point, SA Kozlowski realized ZUNIGA did not speak English and VALENTINO began to translate. The following is a brief synopsis of what VALENTINO translated from ZUNIGA to SA Kozlowski and SA Kozlowski's comments and is not all inclusive.

9

a) VALENTINO relayed that ZUNIGA wanted assurances that the cocaine would be able to be "cooked" and "rocked up," and that the brick would be solid, not re-packaged.

b) According to VALENTINO, ZUNIGA expressed some concern that the cocaine would be re-packaged when it comes in from Mexico stating the kilos could be "soft" as opposed to hard. SA Kozlowski stated ZUNIGA would be able to look at the kilograms to check them out.

c) VALENTINO relayed that ZUNIGA would want to open up each kilogram and weigh each one in front of SA Kozlowski and offer to pay any pro-rated rate for inconsistencies in the weight.

d) SA Kozlowski stated that he wanted to complete the transaction at the ATF UC location, and VALENTINO and ZUNIGA agreed.

e) SA Kozlowski confirmed the price of $26,000.00 for each kilogram if VALENTINO and ZUNIGA purchased two kilograms. VALENTINO stated that ZUNIGA knew the price and also knew it would be $24,500.00 if ZUNIGA were to purchase ten (10) kilograms.

f) SA Kozlowski told VALENTINO and ZUNIGA that the cocaine would not be ready for purchase until the following week. VALENTINO was somewhat surprised and responded that ZUNIGA wanted to purchase the kilograms right now. SA

Kozlowski provided an explanation and told them he would have the cocaine by Monday, June 23, 2014. VALENTINO stated that ZUNIGA was looking to buy now and that ZUNIGA sells it as soon as he acquires it. ZUNIGA, however, agreed to wait until next Monday and VALENTINO relayed that ZUNIGA always needs "work" (street vernacular for drugs).

g) VALENTINO told SA Kozlowski that ZUNIGA wanted to purchase only two (2) kilograms of cocaine on Monday, but ZUNIGA would buy another two (2) kilograms the following day.

h) SA Kozlowski asked how much cocaine ZUNIGA wanted to purchase in total and VALENTINO relayed that ZUNIGA wanted to purchase ten (10) kilograms but only wanted to do two (2) kilograms at a time. VALENTINO said that he even asked ZUNIGA why ZUNIGA did not want to purchase all ten (10) kilograms at once and receive a lower price, and ZUNIGA stated that he wanted to establish a relationship with SA Kozlowski first.

i) VALENTINO stated that ZUNIGA also sells "black" (street vernacular for heroin) and asked if SA Kozlowski was interested in purchasing heroin.

j) VALENTINO stated ZUNIGA would have the money for two (2) kilograms of cocaine on Monday and would want to purchase

11

two (2) kilograms per day. SA Kozlowski stated he would have all ten (10) kilograms by next Monday.

k) VALENTINO stated that ZUNIGA normally purchases as much as eighteen (18) kilograms at a time. VALENTINO also stated that ZUNIGA once bought ten (10) kilograms from another source and later came back to buy twenty (20) more kilograms which ultimately scared the source who then did not want to deal with ZUNIGA any further. VALENTINO stated ZUNIGA would want to eventually purchase ten (10), fifteen (15) to twenty (20) kilograms of cocaine at a time from SA Kozlowski.

33. On June 22, 2014, at approximately 1:14 P.M., SA Kozlowski called VALENTINO to confirm the meeting set for June 23, 2014.

34. On June 23, 2014, at approximately 9:05 a.m., VALENTINO called SA Kozlowski stating that VALENTINO and ZUNIGA were able to meet that day.

35. On June 23, 2014, at approximately 2:15 p.m., VALENTINO pulled up in front of the ATF UC location but did not enter the UC location. Shortly thereafter, ZUNIGA arrived. At approximately 2:16 p.m., SA Kozlowski and Montebello Detective Ray Camuy let VALENTINO and ZUNIGA into the ATF UC Location and took them in a break room area of the location. Detective Camuy is fluent in the Spanish language. ZUNIGA carried with him a red

bag which contained a heat sealer, heat seal bags, rubber gloves, a fireplace lighter, a utility knife, and duct tape.

36. Detective Camuy informed me that at approximately 2:19 p.m., Det. Camuy asked ZUNIGA in Spanish if ZUNIGA wanted to look at one of the packages of cocaine for inspection and ZUNIGA replied that he did want to inspect the cocaine for quality.[1] ZUNIGA then began opening and breaking down each individually wrapped kilogram using an orange box cutter he brought with him. ZUNIGA opened each wrapped kilogram and examined the contents and the wrapping. ZUNIGA then placed a small amount of cocaine on the metal top of the weight scale and burned it with the lighter to check its quality. ZUNIGA asked Det. Camuy what stamp did the cocaine have and Detective Camuy advised him that he was not certain but believed they were "14s" (to represent cocaine from the Sinaloa Cartel). ZUNIGA took a second sample from the cocaine and placed it on the digital scale again. He then burned the second cocaine sample on the scale. ZUNIGA analyzed the flame and melting cocaine on the scale and wafted the smoke towards his face to attempt to detect cutting agents, which are typically used to increase the volume of cocaine.

37. ZUNIGA complained about prior sample-gouges in the cocaine had but stated the quality was good and that he would buy the cocaine after he and the VALENTINO weighed it. ZUNIGA then asked to see the second kilogram which he also cut and stripped of its packaging. ZUNIGA immediately rejected that kilogram and

---

[1] The packaged cocaine was actual cocaine that was seized by the Montebello Police Department in an unrelated investigation.

asked if Det. Camuy had another one to show him. Det. Camuy told him he was sorry that ZUNIGA did not like the kilogram and would bring him another one for his inspection. SA Kozlowski went to retrieve another kilogram of cocaine, which ZUNIGA inspected and approved. ZUNIGA stated that he would buy two kilograms of cocaine a day from Detective Camuy as long as they passed his inspection.

38. At approximately 2:33 P.m., ZUNIGA asked VALENTINO to go to the store to purchase plastic bags. VALENTINO left the ATF UC location and went to buy plastic bags to transport the cocaine. As VALENTINO left, he was followed by a surveillance team. The team followed him to a Target store where he eventually came out with plastic bags. Following the trip to Target, VALENTINO stopped at a gas station and put gas into his vehicle.

39. At approximately 2:43 p.m., ZUNIGA made a cellular phone call and told the individual on the phone "yea, they look good and its fine in here, bring the truck."

40. At approximately 2:50 p.m., SA Kozlowski and Det. Camuy followed ZUNIGA to the bay door of the UC location where an older male, Hispanic driver was sitting in an older model pickup truck (green Chevrolet pickup, license plate 5K56701). The older male Hispanic exited the truck and drove off in another vehicle and ZUNIGA entered the driver's side of the truck. ZUNIGA then drove the truck into the warehouse and retrieved a black plastic bag of money from a hidden compartment in the rear left passenger side of the truck and returned to the break room. ZUNIGA then

presented the bag of approximately $52,000 in U.S. currency to Det. Camuy and SA Kozlowski, who counted the money.

41. At approximately 3:04 p.m., VALENTINO returned to the UC location and went back into the break room.

42. At approximately 3:06 p.m., SA Kozlowski and Det. Camuy exited the break room and walked to the rear of the warehouse while giving the "bust" signal. At this time, a team of ATF Agents and Montebello PD officers took VALENTINO and ZUNIGA into custody.

## IV. CONCLUSION

43. Based upon the foregoing facts and my training, education, and experience as an ATF agent, discussions with other ATF agents and law enforcement officers, discussions with criminal defendants and confidential informants, I submit there is probable cause to believe that Joseph Garza VALENTINO and

//
//
//

Oswaldo Alonzo ZUNIGA committed a violation of 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute controlled substances.

_____
Joseph P. Fallon
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed and Sworn to before me
This _____ day of June 2014.

_____
HONORABLE RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE